# Exhibit A

Approved, SCAO

| Original - Court | 2nd copy - Plaintiff |
| 1st copy - Defendant | 3rd copy - Return |

JUDGE JAMES S. JAMO

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>30th JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS AND COMPLAINT | CASE NO.<br>19-474 - CE |

**Court address**
313 W. Kalamazoo Street, Lansing, MI 48933

**Court telephone no.**
(517) 483-6500

| Plaintiff's name(s), address(es), and telephone no(s).<br>DANA NESSEL, Attorney General of the State of Michigan, on behalf of the People of the State of Michigan, | v | Defendant's name(s), address(es), and telephone no(s).<br>ENBRIDGE ENERGY COMPANY, INC.<br>c/o The Corporation Company, Resident Agent<br>40600 Ann Arbor Road E, Suite 201<br>Plymouth, MI 48170 |

Plaintiff's attorney, bar no., address, and telephone no.
S. Peter Manning (P45719), Robert P. Reichel (P31878),
Daniel P. Bock (P71246), & Charlie A. Cavanagh (P79171)
Attorneys General for the State of Michigan
P.O. Box 30755
Lansing, MI 48909          (517) 335-7664

**SUMMONS**  **NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued JUN 2 7 2019 | This summons expires SEP 2 5 2019 | Court clerk |

*This summons is invalid unless served on or before its expiration date.
This document must be sealed by the seal of the court.

**COMPLAINT**  *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains  ☐ is no longer  pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |

**General Civil Cases**
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains  ☐ is no longer  pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Lansing, MI | Defendant(s) residence (include city, township, or village)<br>Houston, TX |

Place where action arose or business conducted
Emmet and Mackinac Counties

| 6/27/19 | *Daniel P. Bock* |
| Date | Signature of attorney/plaintiff |

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (3/08)  **SUMMONS AND COMPLAINT**    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

JUDGE JAMES

Approved, SCAO

Original - Court      2nd copy - Plaintiff
1st copy - Defendant    3rd copy - Return

| STATE OF MICHIGAN | **SUMMONS AND COMPLAINT** | CASE NO. |
|---|---|---|
| **JUDICIAL DISTRICT** | | |
| **30th JUDICIAL CIRCUIT** | | 19 - 474 - CE |
| **COUNTY PROBATE** | | |

| Court address | Court telephone no. |
|---|---|
| 313 W. Kalamazoo Street, Lansing, MI 48933 | (517) 483-6500 |

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| DANA NESSEL, Attorney General of the State of Michigan, on behalf of the People of the State of Michigan, | v | ENBRIDGE ENERGY, Limited Partnership c/o The Corporation Company, Resident Agent 40600 Ann Arbor Road E, Suite 201 Plymouth, MI 48170 |

| Plaintiff's attorney, bar no., address, and telephone no. |
|---|
| S. Peter Manning (P45719), Robert P. Reichel (P31878), Daniel P. Bock (P71246), & Charlie A. Cavanagh (P79171) Attorneys General for the State of Michigan P.O. Box 30755 Lansing, MI 48909      (517) 335-7664 |

**SUMMONS**    **NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
|---|---|---|
| JUN 27 2019 | SEP 2 6 2019 | BRANDY KIESELBACH |

*This summons is invalid unless served on or before its expiration date.
This document must be sealed by the seal of the court.

**COMPLAINT**    *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains   ☐ is no longer   pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains   ☐ is no longer   pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Lansing, MI | Houston, TX |

| Place where action arose or business conducted |
|---|
| Emmet and Mackinac Counties |

| Date | Signature of attorney/plaintiff |
|---|---|
| 6/27/19 | Daniel P. Bock |

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01 (3/08) **SUMMONS AND COMPLAINT**    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

Approved, SCAO

Original - Court
1st copy - Defendant

2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>30th JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS AND COMPLAINT | CASE NO.<br>19 - 474 - CE |
|---|---|---|

| **Court address** | | **Court telephone no.** |
|---|---|---|
| 313 W. Kalamazoo Street, Lansing, MI 48933 | | (517) 483-6500 |

| Plaintiff's name(s), address(es), and telephone no(s).<br>DANA NESSEL, Attorney General of the State of<br>Michigan, on behalf of the People of the State of Michigan, | v | Defendant's name(s), address(es), and telephone no(s).<br>ENBRIDGE ENERGY PARTNERS, L.P.<br>c/o The Corporation Company, Resident Agent<br>40600 Ann Arbor Road E, Suite 201<br>Plymouth, MI 48170 |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>S. Peter Manning (P45719), Robert P. Reichel (P31878),<br>Daniel P. Bock (P71246), & Charlie A. Cavanagh (P79171)<br>Attorneys General for the State of Michigan<br>P.O. Box 30755<br>Lansing, MI 48909          (517) 335-7664 | | |

**SUMMONS**  **NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued JUN 27 2019 | This summons expires SEP 26 2019 | Court clerk BRANDY KIESELBACH |
|---|---|---|

*This summons is invalid unless served on or before its expiration date.
This document must be sealed by the seal of the court.

**COMPLAINT**  *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Lansing, MI | Defendant(s) residence (include city, township, or village)<br>Houston, TX |
|---|---|
| Place where action arose or business conducted<br>Emmet and Mackinac Counties | |

6/27/19
Date

_Daniel P. Bock_
Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (3/08)  **SUMMONS AND COMPLAINT**     MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

DANA NESSEL, ATTORNEY GENERAL
OF THE STATE OF MICHIGAN, ON
BEHALF OF THE PEOPLE OF THE STATE
OF MICHIGAN,

No. 19- 474          - CE

Plaintiff,

HON. JUDGE JAMES S. JAMO

v

ENBRIDGE ENERGY LIMITED
PARTNERSHIP, ENBRIDGE ENERGY
COMPANY, INC., and ENBRIDGE ENERGY
PARTNERS, L.P.,

Defendants.

_____

S. Peter Manning (P45719)
Division Chief
Robert P. Reichel (P31878)
First Assistant
Daniel P. Bock (P71246)
Charles A. Cavanagh (P79171)
Assistant Attorneys General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
Attorneys for Plaintiff

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Dana Nessel, Attorney General of the State of Michigan, on behalf of the

People of the State of Michigan, by and through the undersigned Assistant

Attorneys General, alleges as follows:

1

## NATURE OF THE CASE

1.     The Attorney General brings this action to abate the continuing threat of grave harm to critical public rights in the Great Lakes and associated resources posed by the Defendants' daily transportation of millions of gallons of oil in dual pipelines that lie exposed in open water on State-owned bottomlands at the Straits of Mackinac.  This location – where Lakes Michigan and Huron connect and multiple busy shipping lanes converge – combines great ecological sensitivity with exceptional vulnerability to anchor strikes like those that occurred in 2018, making it uniquely unsuitable for oil pipelines.  Defendants' continued operation of the Straits Pipelines presents an extraordinary, unreasonable threat to public rights because of the very real risk of further anchor strikes, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits.

2.     The Attorney General seeks declaratory judgments that:  (a) the 1953 Easement granted by the State, which authorized the construction and operation of the Straits Pipelines, violates the public trust doctrine and is therefore void; (b) Defendants' continued operation of the Straits Pipelines unreasonably interferes with rights common to the public and is therefore subject to abatement as  a common law public nuisance; and (c) Defendants' continued operation of the Straits Pipelines is likely to cause pollution, impairment, and destruction of water and other natural resources and the public trust therein in violation of Part 17 (Michigan Environmental Protection Act) of the Natural Resources and

Environmental Protection Act, MCL 324.1701 *et seq.* The complaint seeks injunctive relief requiring the Defendants to (a) cease operation of the Straits Pipelines as soon as possible after a reasonable notice period to allow orderly adjustments by affected parties; and (b) permanently decommission the Straits Pipelines in accordance with applicable law and plans approved by the State of Michigan.

## PARTIES

3.    Dana Nessel is the duly elected Attorney General of the State of Michigan pursuant to Article V, Section 21 of the Michigan Constitution and is the chief legal officer of the State of Michigan. She has the statutory and common law authority to bring this action on behalf of the people of the State of Michigan.

4.    Enbridge Energy, Limited Partnership is a Delaware limited partnership conducting business in Michigan.

5.    Enbridge Energy Company, Inc. is a Delaware corporation conducting business in Michigan.

6.    Enbridge Energy Partners, L.P. is a Delaware limited partnership conducting business in the State of Michigan.

7.    Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P., (collectively "Enbridge") control and operate the Enbridge Line 5 pipeline that extends from Superior, Wisconsin, across the Upper Peninsula of Michigan, crosses the Straits of Mackinac through the Straits Pipelines portion of Line 5, and continues through the Lower Peninsula to

Marysville, Michigan and then crosses beneath the St. Clair River to Sarnia, Ontario, Canada.

## JURISDCITION AND VENUE

8.     This Court has subject matter jurisdiction of this civil matter under MCL 600.605.

9.     Venue for this civil action brought by the Attorney General is proper in this Court under MCL 14.102 and MCL 600.1631.

## FACTUAL BACKGROUND

### The Development of Line 5 and the Straits Pipelines

10.     As explained in the Michigan Petroleum Pipeline Task Force Report (2015), "what is now known as Enbridge's Line 5, including the Straits Pipelines, was conceived and built as a means of transporting crude oil produced in Alberta to refineries located in Sarnia, Ontario without interruption.  In the late 1940s, Imperial Oil Company, Limited began producing significant quantities of crude oil from Leduc oil fields in Alberta.  It formed a subsidiary, Interprovincial Pipe Line Company (IPL) (a corporate predecessor of Enbridge), which developed a series of pipelines to transport oil from Alberta to various refineries.  By 1950, a pipeline had been completed eastward as far as Superior, Wisconsin, on the shore of Lake Superior.  Over the next few years, Imperial Oil transported approximately 50 million barrels of oil on a fleet of Great Lakes tankers from Superior, Wisconsin to refineries near Sarnia, Ontario."

11.    Because of increasing oil production and because tankers could not operate during winter months on the Great Lakes, IPL decided, in late 1952, to extend its pipeline system from Superior to Sarnia.  IPL, its wholly owned American subsidiary Lakehead Pipeline Company, its primary contractor Bechtel Corporation, and various other contractors completed the entire process of designing the 645-mile-long Line 5 pipeline, obtaining rights of way, securing required approvals, contracting, and constructing it in approximately one year, between November 1952 and January 1954.  This process included:

- Lobbying the Michigan Legislature to enact 1953 PA 10 [later amended and recodified as MCL 324.2129] so that the State, through the Conservation Commission, had the legal authority to grant pipeline easements on state land and lake bottomlands.

- Obtaining pipeline easements, including the Easement for the Straits of Mackinac Pipelines, from the Conservation Commission.

- Obtaining approval of the construction, operation, and maintenance of the pipeline in Michigan from Michigan Public Service Commission under 1929 PA 16.

12.    On April 23, 1953, the Conservation Commission of the State of Michigan granted an easement entitled "Straits of Mackinac Pipe Line Easement Conservation Commission of the State of Michigan to Lakehead Pipeline Company, Inc." (1953 Easement), a copy of which is attached as Exhibit 1.

5

13.     The Easement recited that it was issued by the Conservation Commission under the authority of 1953 PA 10 and in consideration of a one-time payment of $2,450.00 by the Grantee to the Grantor.

14.     Subject to its terms and conditions, the Easement granted the Grantee and its successors and assigns the right "to construct, lay, maintain, use and operate" two 20 inch diameter pipelines for the purpose of transporting petroleum and other products, "over, through, under, and upon" specifically described bottomlands owned by the State of Michigan in the Straits of Mackinac.

15.     Since completing Line 5 in 1954, the Grantee and its successors have continued to operate it, and over time significantly increased the quantity of products transported through it.

16.     The Grantee's present successor, Enbridge, currently transports an average of 540,000 barrels or 22,680,000 gallons of light crude oil, synthetic light crude oil, and/or natural gas liquids per day on Line 5, including the Straits Pipelines.

17.     The Straits Pipelines are each approximately four miles long, run parallel to each other, approximately 1,200 feet apart, and are located approximately three miles west of the Mackinac Bridge, in waters ranging in depth to more than 250 feet.

18.     While the near-shore sections of each Pipeline (those located where the water is less than 65 feet deep) were laid in trenches and covered with soil, most of

6

each pipeline was placed on or above the lakebed, and remains exposed in open water, with no covering shielding it from anchor strikes or other physical hazards.

19.     The lakebed beneath the pipelines varies considerably in depth and is subject to erosion by very strong currents in and beneath the Straits.  Consequently, while some sections of the pipelines rest directly on the lakebed, at many other locations, the pipelines are suspended several feet above the lakebed.  This includes locations where, since 2002, Enbridge has installed more than 150 anchor support structures in an effort to limit unsupported lengths or spans of pipeline to less than the 75-foot maximum prescribed in the Easement.

### The Critical Public Importance of the Straits of Mackinac

20.     The Straits of Mackinac are at the heart of the Great Lakes, a unique ecosystem of enormous public importance.  As noted in *Independent Risk Analysis for the Straits Pipelines* (Michigan Technological University (September 2018)), a report commissioned by the State and carried out by a multi-disciplinary team of experts (Michigan Tech Report):

> The Straits of Mackinac hydraulically link Lakes Michigan and Huron . . . and are wide and deep enough . . . to permit the same average water level in both water bodies, technically making them two lobes of a single large lake. The combined Michigan–Huron system forms the largest lake in the world by surface area and the fourth largest by volume, containing nearly 8% of the world's surface freshwater.  The Straits of Mackinac serve as a hub for recreation, tourism, commercial shipping, as well as commercial, sport and subsistence [tribal] fishing . . . .[1]

---

[1] *Independent Risk Analysis,* p 26; https://mipetroleumpipelines.com/sites/mipetroleumpipelines.com/files/document/pdf/Straits_Independent_Risk_Analysis_Final.pdf.

21.     An oil spill at the Straits threatens a wide range of highly valuable

resources:

> The waters and shoreline areas of Lake Michigan and Lake Huron including
> areas surrounding and adjacent to the Straits of Mackinac contain abundant
> natural resources, including fish, wildlife, beaches, coastal sand dunes,
> coastal wetlands, marshes, limestone cobble shorelines, and aquatic and
> terrestrial plants, many of which are of considerable ecological and economic
> value.  These areas include stretches of diverse and undisturbed Great Lakes
> shorelines that provide habitat for many plant and animal species.[2]

## COUNT I

## The 1953 Easement violates the Public Trust and is Void

22.     Paragraphs 1 through 21 above are re-alleged and incorporated by

reference.

## The Public Trust Doctrine

23.     As the Michigan Supreme Court held in *Glass v Goeckel,* 473 Mich 667,

678-679 (2005):

> [U]nder longstanding principles of Michigan's common law, the state, as
> sovereign, has an obligation to protect and preserve the waters of the Great
> Lakes and the lands beneath them for the public.  The state serves, in effect,
> as the trustee of public rights in the Great Lakes for fishing, hunting, and
> boating for commerce or pleasure.  (Citations and footnote omitted.)

24.     These public rights are protected by a *"high, solemn and perpetual*

trust which it is the duty of the State to forever maintain."  *Collins v Gerhardt,* 237

Mich 38, 49 (1926).

---

[2] *Id.,* p 168.

25.     Both the United States Supreme Court and the Michigan Supreme

Court have held that the public trust doctrine strictly limits the circumstances

under which a state may convey property interests in public trust resources.  In

*Illinois Central Railroad Co v Illinois,* 146 US 387, 455-456 (1892), the court

identified only two exceptions under which such a conveyance is permissible:

> The trust with which they are held, therefore, is governmental and cannot be
> alienated, except in those instances mentioned of parcels used in the
> improvement of the interest thus held, or when parcels can be disposed of
> without detriment to the public interest in the lands and waters remaining.

There, the court held that because neither of those conditions were satisfied

by a state statute purporting to grant submerged lands along the Chicago lakefront

to a private company, a subsequent state statute revoking that grant and restoring

public rights was valid and enforceable. *Id.* at 460.

26.     In *Obrecht v National Gypsum Co,* 361 Mich 399, 412-413 (1960), the

Michigan Supreme Court declared that "[l]ong ago we committed ourselves . . . to

the universally accepted rules of such trusteeship as announced by the [S]upreme

[C]ourt in *Illinois Central,*" including *Illinois Central*'s delineation of the limited

conditions under which public trust resources may be conveyed:

> [N]o part of the beds of the Great Lakes, belonging to Michigan and not
> coming within the purview of previous legislation . . . can be alienated or
> otherwise devoted to private use *in the absence of due finding of 1 of 2*
> *exceptional reasons for such alienation or devotion to nonpublic use.*  One
> exception exists where the State has, *in due recorded form,* determined that a
> given parcel of such submerged land may and should be conveyed "in the
> improvement of the interest thus held" (referring to public trust).  The other
> is present where the State has, *in similar form,* determined that such
> disposition may be made "without detriment to the public interests in the
> lands and waters remaining."

*Obrecht,* 361 Mich at 412-413, quoting *Illinois Central,* 146 US at 455-56 [emphasis added]. The Michigan Legislature has incorporated that common-law standard and "due finding" requirement into Part 325 (Great Lakes Submerged Lands) of the Natural Resources and Environmental Protection Act, MCL 324.32501 *et seq.*[3]

### A. The 1953 Easement Violated the Public Trust, and it was Void from its Inception.

27. The 1953 Easement violated the public trust doctrine because the State never made a finding that the easement: (1) would improve navigation or another public trust interest; or (2) could be conveyed without impairment of the public trust. There is no contemporaneous document in which the State duly determined that the proposed Easement met either of the two exceptions to the common law public trust doctrine's prohibition of conveyances of public rights in Great Lakes bottomlands. The Easement itself contains no such findings. It merely recited:

> WHEREAS, the Conservation Commission is of the opinion that the proposed pipe line system will be of benefit to all of the people of the State of Michigan and in furtherance of the public welfare; and

> WHEREAS, the Conservation Commission duly considered the application of Grantee and at its meeting held on the 13th day of February, A.D. 1953, approved the conveyance of an easement.

---

[3] *See, e.g.,* Mich. Comp. Laws § 324.32502 (conveyance of property interests in submerged lands allowed "whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition"); §§ 324.32503, 324.32505 (same).

28.     There is no indication the Conservation Commission determined that the conveyance of the Easement and the operation of oil pipelines in the Great Lakes would somehow improve public rights in navigation, fishing, or other uses protected by the public trust.  Nor is there evidence that the Commission duly determined that the operation could not adversely affect those rights.  And the contemporaneous approval of the construction of what is now Enbridge's Line 5 in Michigan by the Michigan Public Service Commission made no such determinations and suggested that the Line 5 pipeline, which was built to transport crude oil from Alberta to Ontario, would enhance joint defenses in times of national emergency and promote improved trade relations.[4]

29.     In the absence of either of the due findings required under the public trust doctrine, the 1953 Easement was and remains void.

**B.      The State's Continuing Obligation to Protect Public Trust Resources Now Requires Revocation of the 1953 Easement Because it is Today Clear that Enbridge's Continued Transportation of Petroleum Products through the Straits Pipelines Violates the Public Trust.**

30.     As noted above, public rights in navigable waters "are protected by a *high, solemn* and *perpetual* trust, which it is the duty of the State to forever maintain." *Collins v Gerhardt,* 237 Mich at 48.  The State did not surrender its trust authority – or the affirmative responsibilities that underpin it – when it granted the 1953 Easement to Enbridge's predecessor.  "The state, as sovereign,

---

[4] Mich Pub Serv Comm'n Op and Order for the 1953 Line 5 pipeline (Mar. 31, 1953); https://www.michigan.gov/documents/deq/Appendix_A.3_493982_7.pdf.

cannot relinquish [its] duty to preserve public rights in the Great Lakes and their natural resources." *Glass*, 473 Mich at 679. To the contrary, a state's conveyance of property rights "to private parties leaves intact public rights in the lake and its submerged land. . . . Under the public trust doctrine, the sovereign never had the power to eliminate those rights, *so any subsequent conveyances . . . remain subject to those public rights*." *Id.* at 679-681 [emphasis added]. That all conveyances of bottomlands and other public trust resources are encumbered by the trust has long been the law in Michigan. *See Nedtweg,* 237 Mich at 17 (the public trust "is an inalienable obligation of sovereignty" and "[t]he State may not, by grant, surrender such public rights any more than it can abdicate the police power or other essential power of government.").

31.     When the State conveys a property interest in Great Lakes bottomlands, "it necessarily conveys such property *subject to the public trust.*" *Glass* at 679. Accordingly, even assuming the 1953 Easement was initially valid, it necessarily remains subject to the public trust and the State's continuing duty to protect public trust resources of the Great Lakes. And, by its terms, the Easement broadly reserved the State's rights: "All rights not specifically conveyed herein are reserved to the State of Michigan." 1953 Easement, p 11, paragraph M.

32.     As the Supreme Court held in *Illinois Central,* a grant of property rights in public trust resources "is necessarily revocable, and the exercise of the trust by which the property was held by the state can be resumed at any time." 146 US at 455. There, the State of Illinois "subsequently determined, upon

consideration of public policy" that it should rescind its prior grant of lake bottomlands to a private entity and the court upheld that action.

33. Here, it has now become apparent that continuation of the activity authorized by the 1953 Easement – transporting millions of gallons of petroleum products each day through twin 66-year old pipelines that lie exposed, and literally in the Great Lakes at a uniquely vulnerable location in busy shipping lanes – cannot be reconciled with the State's duty to protect public trust uses of the Lakes, including fishing, navigation, and recreation from potential impairment or destruction. As outlined below, continued operation of the Straits Pipelines presents an extraordinary, unreasonable threat to public rights because of the very real risk of further anchor strikes to the pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits.

### 1. The Continuing Risk of Anchor Strikes Threatens an Oil Spill at the Straits.

34. Independent expert analysis and real-world experience demonstrate that the Straits Pipelines remain highly vulnerable to damage caused by inadvertent deployment and dragging of anchors from the many vessels moving in the multiple shipping lanes that converge at the Straits. So long as oil flows through the Pipelines, the associated threat of a catastrophic spill will continue.

### a.  The Dynamic Risk Report.

35.  In 2016, the State commissioned an expert consulting firm, Dynamic Risk Assessment Systems, Inc., to perform an analysis of alternatives to the Straits Pipelines that included, among other things, risks associated with continued operation of the existing pipelines.  Dynamic Risk completed a Draft Report in the summer of 2017 and issued its Final Report in October 2017 (Report).[5]  In publicly presenting its analysis, Dynamic Risk estimated the chance of rupture of the Straits Pipelines in the next thirty-five years to be not one in a million, nor one in a thousand, nor even one in a hundred, but a remarkable *one in sixty*.[6]  And of the various threats the Report canvassed, it determined that "the dominant threat, representing more than 75% of the annualized total (all-threat) failure probability, is that . . . caused by the inadvertent deployment of anchors from ships traveling through the Straits."[7]

36.  According to the Report, inadvertent anchor strikes are known in the industry to be the principal threat to offshore pipelines.  They are both "increas[ing] in frequency" and "not influenced by mitigation measures":

---

[5] Report, *Alternatives Analysis for the Straits Pipelines;* https://mipetroleumpipelines.com/document/alternatives-analysis-straits-pipeline-final-report.

[6] *See* Statements of James Mihell, P.Eng., at July 6, 2017, Information Meeting at Holt, Michigan, at 3:11:00–3:12:00; https://mipetroleumpipelines.com/event/watch-video-july-6-public-information-session-holt.

[7] Report, *Alternatives Analysis for the Straits Pipelines*, at ES-25; https://mipetroleumpipelines.com/document/alternatives-analysis-straits-pipeline-final-report.

> In offshore pipelines . . . inadvertent anchor deployment and dragging . . .
> represents the most significant threat due to shipping activity; all others
> being of insignificant magnitude by comparison.  The threat associated with
> inadvertent anchor deployment and dragging involves the potential for a
> pipeline to be hooked by anchors that are unintentionally dropped while
> ships are underway, and subsequently dragged, and this threat has seen a
> heightened focus on the part of pipeline owners and operators, due to an
> increase in frequency. . . . *Because this scenario involves inadvertent
> deployment, it is not influenced by mitigation measures, such as warnings and
> signage that are taken to discourage ships from intentionally deploying
> anchors within the Straits of Mackinac.*[8]

37.    The Report goes on to explain how, "[i]n bad weather when there is

movement in both the ship and the anchor, snatches may cause the chain stopper to

break or jump," rendering anchor mechanisms susceptible to inadvertent anchor

deployment *even when operating as designed.*[9]  Bad weather conditions commonly

occur in the Straits of Mackinac.

38.    Moreover, "[a]fter having unintentionally dropped the anchor, the

inadvertent anchor drop may or may not be discovered within a short period of

time," a possibility that, as noted below, is borne out all too well by the recent

anchor strikes in the Straits.[10]

39.    According to the Report, the risk of a pipeline-anchor incident depends

largely on four "vulnerability factors":

(1)    size of the pipeline;

(2)    water depth (relative to anchor chain length);

---

[8] *Id.* at 2-35 (emphasis added).
[9] *Id. at* 2-35-36.
[10] *Id.*

  (3)  pipeline protection (depth of burial, use of armoring material); and

  (4)  number and size distribution of ship crossings per unit of time.

40. The Straits Pipelines score high on all four of these factors:

[I]t must be noted that with respect to the above vulnerability factors, the Straits Crossing segments cross a busy shipping lane . . . . They are also situated in water that is shallow, relative to the anchor chain lengths of most cargo vessels.  Furthermore, a 20-in. diameter pipeline is small enough to fit between the shank and flukes of a stockless anchor for a large cargo vessel, and thus, is physically capable of being hooked.[11]

41. The Report further notes that because the Straits pipelines are, for significant portions of their length, suspended above the lake bottom, they are "therefore more vulnerable" to anchor hooking.

42. It would be extremely difficult to deliberately arrange a more ill-advised setting for exposed pipelines than at the Straits of Mackinac.  The Straits are not simply a "busy shipping lane," as described in the Report.  They are the point of convergence for *multiple* lanes of high-volume domestic and international shipping traffic, concentrating that traffic into a dense procession and funneling it daily across a narrow saddle of lake bottom between two of the largest, deepest, and most heavily trafficked lakes in the world.[12]

43. And on that lake bottom, below the heavily concentrated procession of ships, lie two 20-inch pipelines, at many junctures suspended off the lakebed in relatively shallow water, approximately 1,200 feet apart, perpendicular to the ship

---

[11] *Id.*
[12] *See* image at http://www.shiptraffic.net/2001/04/mackinac-strait-ship-traffic.html.

traffic, ideally sized and situated to catch within the shank and flukes of a typical shipping anchor that is inadvertently deployed.

   b.   **Anchor Strikes Have Actually Occurred in the Straits.**

44.   The risk of anchor strikes at the Straits is very real.  In April 2018, a commercial tug and barge vessel inadvertently dropped and dragged its anchor across the lakebed at the Straits (and apparently for several hundred more miles, unknowingly, until it reached Chicago).[13]  The anchor severed or dragged several active and abandoned electrical transmission cables that lie at the bottom of the Straits in close proximity to the Line 5 Pipelines.

45.   Moreover, both Straits Pipelines were also struck and dented in three places by the anchor, as it dragged across the lakebed[14] though neither ruptured.[15] Fortunately, these strikes to the Pipelines happened to occur at locations where they currently rest on the lakebed rather than other areas where they are

---

[13] *See, e.g.,* Mark Tower, *Broken cables capped as Straits of Mackinac spill response continues,* mlive, Apr. 30, 2018; http://www.mlive.com/news/grand-rapids/index.ssf/2018/04/broken_cables_capped_as_strait.html; Elizabeth Brackett, *Straits of Mackinac Spill Raises New Fears of Great Lakes Disaster,* wttw News (May 1, 2018); https://chicagotonight.wttw.com/2018/05/01/straits-mackinac-spill-raises-new-fears-great-lakes-disaster; National Transportation Safety Board Marine Accident Brief 19/12 *Anchor Contact of Articulated Tug and Barge Clyde S VanEnkevort/Erie Trader with Underwater Cables and Pipelines* https://www.ntsb.gov/investigations/AccidentReports/Pages/MAB1912.aspx.
[14] See, e.g., https://www.bridgemi.com/michigan-environment-watch/watch-video-anchor-damage-line-5-straits-mackinac.
[15] *See, e.g.,* Keith Matheny, *Line 5 oil pipeline in the Straits of Mackinac dented by ship,* Detroit Free Press, Apr. 11, 2018; https://www.freep.com/story/news/local/michigan/2018/04/11/enbridge-line-oil-pipeline-straits-mackinac/507506002/.

suspended above it and particularly vulnerable to the risk of "hooking" identified in the Dynamic Risk Report.

46.    The 2018 anchor strikes were not an isolated event.  At least one other anchor strike in the Straits apparently occurred in April 1979.  Correspondence dated June 14, 1979 from Consumers Energy Company to the Michigan Department of Natural Resources proposing to repair damaged electrical cables located on an easement granted by the Department referred to an outage that occurred on April 12, 1979 and stated:  "Based on our inspection it is assumed that a ship dragging anchor accidentally hooked the cables, resulting in breaking two of the cables and damaging the third and fourth."

47.    In sum, the Report and the actual anchor strikes show that the Straits Pipelines and shipping patterns together create an extreme vulnerability for a catastrophic oil spill.  While the US Coast Guard has promulgated a regulation establishing a Regulated Navigation Area in the Straits of Mackinac that generally prohibits anchoring and loitering or vessels there,[16] such measures regulating intentional anchoring cannot, as noted above, mitigate the principal threat identified in the Report – accidental anchor deployment.  And while the State of Michigan is currently considering a regulation intended to reduce that risk by requiring vessels transiting the Straits to verify the security of their anchors, such a regulation, even if adopted as an interim measure, cannot ensure compliance or eliminate the continuing risk.

---

[16] See 33 CFR 165.994, 83 Federal Register 49283 (October 1, 2018).

###### 2.    Continued Operation of the Straits Pipelines Carries Substantial, Inherent Risk.

48.    Even apart from their unique susceptibility to damage from anchor strikes, the Straits Pipelines, like all hazardous materials pipelines, present inherent risks of environmental harm.  Regardless of a pipeline operator's safety culture and the sophistication of its integrity management system, it has become clear that accidents, manufacturing defects, human error, and failures of material are an enduring, *inherent* feature of hazardous materials pipeline operation. According to United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) data, since 2014, there have been nearly 12,000 reported "incidents"[17] (an average of 666 per year) on pipelines across the United States.[18]  In that time, Michigan has seen an average of approximately 20 incidents per year.[19]

---

[17] An "incident" is defined by PHMSA as a pipeline occurrence resulting in any of the following:  a fatality or injury requiring in-patient hospitalization; $50,000 (1984 dollars) or more in total costs; highly volatile liquid releases of 5 barrels or more or other liquid releases of 50 barrels or more; liquid releases resulting in an unintentional fire or explosion.  *See* PHMSA, *Pipeline Incident Flagged Files*; https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-incident-flagged-files.

[18] *See* PHMSA Pipeline Incidents (1999-2018).

[19] *See* PHMSA Pipeline Incidents:  Michigan (1999-2018).

49.     Between 2006 and 2018, Enbridge reported 126 pipeline "incidents."[20]
Most notably, in July 2010, Enbridge's Line 6B ruptured and for hours continued to
pump crude oil into Talmadge Creek, a tributary of the Kalamazoo River, near
Marshall, Michigan.  The resulting damage to the lands, waters, wildlife, and other
resources of that watershed were extensive, requiring years of clean-up efforts.  The
National Transportation Safety Board (NTSB) has identified the Marshall spill as
"the single most expensive on-shore spill in US history."[21]  In examining the causes
of the Line 6B spill, the NTSB determined that Enbridge "staff failed to recognize
that the pipeline had ruptured until notified by an outside caller more than 17
hours later."  It concluded "that the Line 6B segment ruptured under normal
operating pressure due to corrosion fatigue cracks" and that "[t]he rupture and
prolonged release were made possible by pervasive organizational failures at
Enbridge[.]"[22]

---

[20] *See* PHMSA, *Pipeline Incident Flagged Files*; https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-incident-flagged-files.  Another recent compilation of federal data indicates that "the U.S. portion of the pipeline network owned by Enbridge and its joint ventures and subsidiaries suffered 307 hazardous liquids incidents from 2002 to August 2018 – around one spill every 20 days on average." Greenpeace Reports, *Dangerous Pipelines:  Enbridge's History of Spills Threatens Minnesota Waters*, at 6 (Nov. 2018); https://www.greenpeace.org/usa/wp-content/uploads/2018/11/Greenpeace-Report-Dangerous-Pipelines.pdf.
[21] *See* NTSB News Release, *Pipeline Rupture and Oil Spill Accident Caused by Organizational Failures and Weak Regulations* (July 10, 2012); https://www.ntsb.gov/news/press-releases/Pages/PR20120710.aspx.
[22] NTSB, *Accident Report:  Enbridge Incorporated Hazardous Liquid Pipeline Rupture and Release, Marshall Michigan, July 25, 2010* (NTSB Line 6B Report), at xiii, 84, 121; https://www.ntsb.gov/investigations/AccidentReports/Reports/PAR1201.pdf.

50.     While the design of the Straits Pipelines differs from that of Line 6B,
and Enbridge has attested to improvements in its safety culture and pipeline
integrity protocols since the Marshall spill, significant issues persist.  Enbridge has
reported 72 pipeline incidents since 2010.[23]  And, for example, in recent months,
explosions have at least twice occurred on Enbridge natural gas pipelines.  In
October 2018, an Enbridge natural gas pipeline exploded near Prince George,
British Columbia, in close proximity to a First Nation village.[24]  In January 2019,
another Enbridge pipeline in Ohio failed with the resulting "fireball" visible from 15
miles away.[25]  Apparently, in each instance Enbridge's pipeline inspection
technology and improved safety culture did not predict, much less prevent these
failures.

51.     As a part of its analysis of various potential threats to the integrity of
the Straits Pipelines, Dynamic Risk sought to identify what it classified as the
"Principal Threats," i.e., "Threats for which an evaluation of susceptibility
attributes indicates *a significant vulnerability*, and that have the potential to

---

[23] PHMSA, Operator Information, Enbridge Energy;
https://primis.phmsa.dot.gov/comm/reports/operator/OperatorIM_opid_11169.html?
nocache=1967#_OuterPanel_tab_2.
[24] Global News, *Enbridge natural gas pipeline explodes near Prince George*, Oct. 10,
2018; https://globalnews.ca/video/4531983/enbridge-natural-gas-pipeline-explodes-
near-prince-george.
[25] CBC News, *Enbridge pipeline explosion sends fireball into Ohio sky*, Jan. 22,
2019; https://www.cbc.ca/news/canada/calgary/enbridge-ohio-pipeline-explosion-
1.4987897.

21

provide the most significant contributions to overall failure probability."[26] The

threats considered included "incorrect operations," which were described as follows:

> The threats to transmission pipeline integrity from incorrect operations
> include, but are not necessarily limited to accidental over-pressurization,
> exercising inadequate or improper corrosion control measures, and
> improperly maintaining, repairing, or calibrating piping, fittings, or
> equipment.[27]

52. Dynamic Risk concluded that notwithstanding the various operational

and procedural changes that Enbridge adopted after the Line 6B failure, "incorrect

operations" remain a Principal Threat for the Straits Pipelines:

> . . . [S]ince the Marshall incident in 2010, Enbridge has undertaken a review
> and upgrade of the management systems by which it controls its pipeline
> operations. Despite this, numerous pipeline investigation analyses have
> shown that regardless of the direct cause, some element of incorrect
> operations, such as procedural, process, implementation or training factors
> invariably plays a role in the root causes of pipeline failure. Furthermore, it
> is often impossible to foresee in advance what sequence of events and
> breakdown in management systems and operating practices might lead to
> failure. For this reason, failures that are related to incorrect operations
> cannot be discounted, and are considered a Principal Threat.[28]

53. In sum, continued operation of the Straits Pipelines presents

significant, inherent risks of releases of hazardous substances into the environment.

---

[26] Dynamic Risk Report, p 98 (emphasis added).
[27] *Id.*, p 124.
[28] *Id.*, p 134.

**3.    An Oil Spill at the Straits Risks Catastrophic
Environmental and Economic Consequences, including Severe
Impairment of Public Trust Rights.**

54.    As noted above, *Independent Risk Analysis for the Straits Pipelines*
(Michigan Technological University (September 2018)), is a report commissioned by
the State and carried out by a multi-disciplinary team of experts (Michigan Tech
Report).

55.    The Report analyzed the consequences of a "worst case" spill of oil from
the Straits Pipelines under various seasonal and other conditions, taking into
account the wide range of resources and activities that would likely be affected by
such a spill.

56.    Among other things, water currents in the Straits are unusually
strong, complex, and variable:

> Water currents in the Straits of Mackinac can reach up to 1 [meter per
> second] and can also reverse direction every 2-3 days flowing either easterly
> into Lake Huron or westerly towards Lake Michigan. . . . Flow volumes
> through the Straits can reach 80,000 [cubic meters per second] and thus play
> essential roles in navigation and shipping in this region, the transport of
> nutrients, sediments and contaminants between Lakes Michigan and Huron,
> and also the ecology and biodiversity of this region.[29]

57.    Consequently, oil spilled into the Straits could be transported into
either Lake, and depending upon the season and weather conditions, impact up to
hundreds of miles of Great Lakes shoreline.[30]

---

[29] Michigan Tech Report, p 56.
[30] *Id.,* pp 68-69.

58.    Crude oil contains toxic compounds that would cause both short- and long-term harm to biota, habitat, and ecological food webs.[31] Numerous species of fish, especially in their early life stages, as well as their spawning habitats and their supporting food chains are also at risk from an oil spill.[32] Viewed as a whole, the ecological impacts would be both widespread and persistent.[33]

59.    And "[b]ecause of the unique and complex environment of the Great Lakes and Straits area . . .," it is uncertain how effectively and at what cost the affected resources could be restored.[34]

60.    The Michigan Tech Report also estimated several forms of natural resources and other economic damages that would likely result from a worst-case oil spill from the Straits Pipelines.[35] Among other findings, the Report estimated large damages to recreational fishing, recreational boating, commercial fishing, and commercial navigation,[36] all activities within the core rights subject to the public trust.

61.    Finally, the Report estimated that the total of all cleanup costs and economic damages that it was able to measure would be $1.878 billion, but that figure was necessarily incomplete.[37] A different report conducted by researchers at

---

[31] *Id.,* pp 166-168, 176, 181-185.
[32] *Id.,* pp 192-199.
[33] *Id.,* pp 213-214.
[34] *Id.,* pp 261-264.
[35] *Id.,* pp 271-273.
[36] *Id.,* pp 285-294.
[37] *Id.,* p ES-31.

Michigan State University, using different assumptions and methods, estimated the damages from a spill from the Straits Pipelines at $5.6 billion.[38]

62.     In any event, regardless of the precise details of these estimates, it is now apparent that the continued operation of the Straits Pipelines presents a substantial, inherent risk of an oil spill and that such a spill would have grave ecological and economic consequences, impairing public rights in the Great Lakes and its resources.  Given the magnitude of the threatened harm, continuation of oil transport through the Straits Pipelines is fundamentally unreasonable and inconsistent with the State's perpetual duty to protect the inalienable public trust.

63.     An actual controversy exists between the Parties as to whether (a) the 1953 Easement was void from its inception in the absence of the due findings required under the public trust doctrine; and (b) Enbridge's continued operation of the Straits Pipelines violates the public trust and is therefore unlawful.

## COUNT II

### Public Nuisance

64.     Paragraphs 1 through 63 above are re-alleged and incorporated by reference.

65.     At common law, including the common law of Michigan, a condition, action, or failure to act that unreasonably interferes with a right common to the

---

[38] Nathan Brugnone and Robert B. Richardson, Mich. State Univ. Dep't of Cmty. Sustainability, *Oil Spill Economics:  Estimates of the Damages of an Oil Spill in the Straits of Mackinac in Michigan.*  https://flowforwater.org/wp-content/uploads/2018/05/FLOW_Report_Line-5_Final-release-1.pdf.

general public is a public nuisance. A condition, action, or failure to act is
unreasonable when it is of a continuing nature and the actor knows it has a
significant effect upon the public right.[39] The attorney general may bring an action
for injunctive relief to prevent or abate such a public nuisance.

66. The waters and aquatic resources of Lakes Huron and Michigan within
Michigan's boundaries are held in trust for the benefit of the people of the State of
Michigan. The public rights in those waters and resources include, but are not
limited to, fishing, boating, commercial navigation, and recreation.

67. By continuing to transport oil through the Straits Pipelines that lie
exposed in the waters of the Great Lakes where multiple shipping lanes converge,
despite the recently demonstrated risks of anchor strikes, the inherent risks of
pipeline operations, and the foreseeable consequences of an oil spill at the Straits,
Enbridge has created a continuing, unreasonable risk of catastrophic harm to public
rights. As such, Enbridge is maintaining a public nuisance.

## COUNT III

### Michigan Environmental Protection Act

68. Paragraphs 1 through 67 above are re-alleged and incorporated by
reference.

69. Part 17 (Michigan Environmental Protection Act) of the Natural
Resources and Environmental Protection Act, 1994 PA 451, provides:

> The attorney general or any person may maintain an action
> in the circuit court having jurisdiction where the alleged violation

---

[39] Restatement (Second) of Torts § 821B (1979).

26

occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in those resources from pollution, impairment, or destruction. MCL 324.1701(1).

70. As set forth above, Enbridge's conduct – continuing to transport oil though the Straits Pipelines in the face of substantial risks of grave environmental harm – is likely to cause pollution, impairment, or destruction of the water and other natural resources of the Great Lakes and the public trust in those resources.

## RELIEF REQUESTED

For the reasons stated in this complaint, the Plaintiff requests that this Court grant the following relief:

A. A declaratory judgment that in the absence of the due findings required under the public trust doctrine, the 1953 Easement was void from its inception, and that Enbridge has no further right to maintain and operate the Straits Pipelines under its terms;

B. A declaratory judgment that under the present circumstances, the 1953 Easement violates the public trust and should be revoked, and that Enbridge has no further right to maintain and operate the Straits Pipelines under its terms;

C. A declaratory judgment that Enbridge's continued operation of the Straits Pipelines is a public nuisance subject to abatement;

D. A declaratory judgment that Enbridge's continued operation of the Straits Pipelines is likely to cause pollution, impairment, or destruction of water and other natural resources and the public trust therein and thereby violates the Michigan Environmental Protection Act;

27

E.     A permanent injunction requiring Enbridge to (1) cease operation of the Straits Pipelines as soon as possible after a reasonable notice period to allow orderly adjustments by affected parties; and (2) permanently decommission the Straits Pipelines in accordance with applicable law and plans approved by the State of Michigan; and

F.     Any other relief that the Court finds just and reasonable.

Respectfully submitted,

Dana Nessel
Attorney General

S. Peter Manning (P45719)
Division Chief
Robert P. Reichel (P31878)
First Assistant
Daniel P. Bock (P71246)
Charles A. Cavanagh (P79171)
Assistant Attorneys General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
Attorneys for Plaintiff
BockD@michigan.gov
CavanaghC2@michigan.gov

Dated:  June 27, 2019

LF:  Enbridge Energy, LP (SOM v)/#2019-0253664-B-L /Complaint 2019-6-27

28

# Exhibit 1

123

STRAITS OF MACKINAC PIPE LINE EASEMENT

CONSERVATION COMMISSION OF THE STATE OF MICHIGAN

TO

LAKEHEAD PIPE LINE COMPANY, INC.

THIS EASEMENT, executed this twenty-third day of April, A. D. 1953, by the State of Michigan by the Conservation Commission, by Wayland Osgood, Deputy Director, acting under and pursuant to a resolution adopted by the Conservation Commission at its meeting held on February 13, 1953, and by virtue of the authority conferred by Act No. 10, P. A. 1953, hereinafter referred to as Grantor, to Lakehead Pipe Line Company, Inc., a Delaware corporation, of 510 22nd Avenue East, Superior, Wisconsin, hereinafter referred to as Grantee,

W I T N E S S E T H:

WHEREAS, application has been made by Grantee for an easement authorizing it to construct, lay and maintain pipe lines over, through, under and upon certain lake bottom lands belonging to the State of Michigan, and under the jurisdiction of the Department of Conservation, located in the Straits of Mackinac, Michigan, for the purpose of transporting petroleum and other products; and

WHEREAS, the Conservation Commission is of the opinion that the proposed pipe line system will be of benefit to all of the people of the State of Michigan and in furtherance of the public welfare; and

WHEREAS, the Conservation Commission duly considered the application of Grantee and at its meeting held on the 13th day of February, A. D. 1953, approved the conveyance of an easement.

-1-

124

NOW, THEREFORE, for and in consideration of the sum of Two Thousand Four Hundred Fifty Dollars ($2,450.00), the receipt of which is hereby acknowledged, and for and in consideration of the undertakings of Grantee and subject to the terms and conditions set forth herein, Grantor hereby conveys and quit claims, without warranty express or implied, to Grantee an easement to construct, lay, maintain, use and operate two (2) pipe lines, one to be located within each of the two parcels of bottom lands hereinafter described, and each to consist of twenty inch (20") O D pipe, together with anchors and other necessary appurtenances and fixtures, for the purpose of transporting any material or substance which can be conveyed through a pipe line, over, through, under and upon the portion of the bottom lands of the Straits of Mackinac in the State of Michigan, together with the right to enter upon said bottom lands, described as follows:

> All bottom lands of the Straits of Mackinac, in the State of Michigan, lying within an area of fifty (50) feet on each side of the following two center lines:

> (1) Easterly Center Line: Beginning at a point on the northerly shore line of the Straits of Mackinac on a bearing of South twenty-four degrees, no minutes and thirty-six seconds East (S 24° 00' 36" E) and distant one thousand seven hundred and twelve and eight-tenths feet (1,712.8') from United States Lake Survey Triangulation Station "Green" (United States Lake Survey, Latitude 45° 50' 00", Longitude 84° 44' 58"), said point of beginning being the intersection of the center line of a twenty inch (20") pipe line and the said northerly shore line; thence, on a bearing of South fourteen degrees thirty-seven minutes and fourteen seconds West (S 14° 37' 14" W) a distance of nineteen thousand one hundred and forty-six and no tenths feet (19,146.0') to a point on the southerly shore line of the Straits of Mackinac which point is the intersection of the said center line of the twenty inch (20") pipe line and the said southerly shore line; and is distant seven hundred and seventy-four and seven tenths feet (774.7') and on a bearing of South thirty-six degrees, eighteen minutes and forty-five seconds West (S 36° 18' 45" W) from United States Lake Survey Tri-angulation Station "A. Mackinac West Base" (United States

125

Lake Survey, Latitude 45° 47' 14", Longitude 84°
46' 22").

(2) Westerly Center Line:  Beginning at a point on the
northerly shore line of the Straits of Mackinac on a
bearing of South forty-nine degrees, twenty-five minutes
and forty-seven seconds East (S 49° 25' 47" E) and dis-
tant two thousand six hundred and thirty-four and nine
tenths feet (2,634.9') from United States Triangulation
Station "Green" (United States Lake Survey, Latitude
45° 50' 00", Longitude 84° 44' 58") said point of be-
ginning being the intersection of the center line of a
twenty inch (20") pipe line and the said northerly shore
line; thence on a bearing of South fourteen degrees,
thirty-seven minutes and fourteen seconds West (S 14°
37' 14" W), a distance of nineteen thousand four hundred
and sixty-five and no tenths feet (19,465.0') to a point
on the southerly shore line of the Straits of Mackinac
which point is the intersection of the said center line
of the twenty inch (20") pipe line and the said southerly
shore line and is distant one thousand no hundred and
thirty-six and four tenths feet (1,036.4') on a bearing
of South sixty-three degrees, twenty minutes and fifty-
four seconds East (S 63° 20' 54" E) from United States
Lake Survey Triangulation Station "A. Mackinac West
Base" (United States Lake Survey, Latitude 45° 47' 14",
Longitude 84° 46' 22").

TO HAVE AND TO HOLD the said easement unto said Grantee, its

successors and assigns, subject to the terms and conditions herein set

forth, until terminated as hereinafter provided.

This easement is granted subject to the following terms and

conditions:

A.  Grantee in its exercise of rights under this easement,

including its designing, constructing, testing, operating,

maintaining, and, in the event of the termination of this

easement, its abandoning of said pipe lines, shall follow

the usual, necessary and proper procedures for the type of

operation involved, and at all times shall exercise the due

care of a reasonably prudent person for the safety and welfare

-3-

126

of all persons and of all public and private property,
shall comply with all laws of the State of Michigan and
of the Federal Government, unless Grantee shall be con-
testing the same in good faith by appropriate proceedings,
and, in addition, Grantee shall comply with the following
minimum specifications, conditions and requirements, unless
compliance therewith is waived or the specifications or
conditions modified in writing by Grantor:

(1) All pipe line laid in water up to fifty
(50) feet in depth shall be laid in a ditch
with not less than fifteen (15) feet of cover.
The cover shall taper off to zero (0) feet at
an approximate depth of sixty-five (65) feet.
Should it be discovered that the bottom material
is hard rock, the ditch may be of lesser depth,
but still deep enough to protect the pipe lines
against ice and anchor damage.

(2) Minimum testing specifications of the twenty
inch (20") OD pipe lines shall be not less than
the following:

Shop Test----------1,700 pounds per square inch gauge
Assembly Test------1,500 pounds per square inch gauge
Installation Test--1,200 pounds per square inch gauge
Operating Pressure- 600 pounds per square inch gauge

(3) All welded joints shall be tested by X-Ray.

-4-



(4) The minimum curvature of any section of pipe shall be no less than two thousand and fifty (2,050) feet radius.

(5) Automatic gas-operated shut-off valves shall be installed and maintained on the north end of each line.

(6) Automatic check valves shall be installed and maintained on the south end of each line.

(7) The empty pipe shall have a negative buoyancy of thirty (30) or more pounds per linear foot.

(8) Cathodic protection shall be installed to prevent deterioration of pipe.

(9) All pipe shall be protected by asphalt primer coat, by inner wrap and outer wrap composed of glass fiber fabric material and one inch by four inch (1" x 4") slats, prior to installation.

(10) The maximum span or length of pipe unsupported shall not exceed seventy-five (75) feet.

(11) The pipe weight shall not be less than one hundred sixty (160) pounds per linear foot.

(12) The maximum carbon content of the steel, from which the pipe is manufactured, shall not be in excess of .247 per cent.

128

(13)  In locations where fill is used, the top of the fill shall be no less than fifty (50) feet wide.

(14)  In respect to other specifications, the line shall be constructed in conformance with the detailed plans and specifications heretofore filed by Grantee with Lands Division, Department of Conservation of the State of Michigan.

B.  Grantee shall give timely notice to the Grantor in writing:

(1)  Of the time and place for the commencement of construction over, through, under or upon the bottom lands covered by this easement, said notice to be given at least five (5) days in advance thereof;

(2)  Of compliance with any and all requirements of the United States Coast Guard for marking the location of said pipe lines;

(3)  Of the filling of said pipe lines with oil or any other substance being transported commerially;

(4)  Of any breaks or leaks discovered by Grantee in said pipe lines, said notice to be given by telephone promptly upon discovery and thereafter confirmed by registered mail;

-6-

129

(5)  Of the completion of any repairs of said
pipe lines, and time of testing thereof, said
notice to be given in sufficient time to per-
mit Grantor's authorized representatives to be
present at the inspection and testing of the
pipe lines after said repairs; and

(6)  Of any plan or intention of Grantee to
abandon said pipe lines, said notice to be
given at least sixty (60) days prior to commence-
ment of abandonment operations.

C.  The easement herein conveyed may be terminated by
Grantor:

(1)  If, after being  notified in writing by
Grantor of any specified breach of the terms
and conditions of this easement, Grantee shall
fail to correct said breach within ninety (90)
days, or, having commenced remedial action within
such ninety (90) day period, such later time as
it is reasonably possible for the Grantee to cor-
rect said breach by appropriate action and the
exercise of due diligence in the correction thereof;
or

130

(2)  If Grantee fails to start construction of
the pipe lines authorized herein within two years
from date of execution of this instrument; or

(3)  If Grantee fails for any consecutive three-
year period to make substantial use of said pipe
lines commercially and also fails to maintain said
pipe lines during said period in such condition as
to be available to commercial use within thirty
(30) days.

D.  Construction of the pipe lines contemplated by this
instrument shall not be commenced until all necessary authori-
zation and assent of the Corps of Engineers, United States
Army, so far as concerns the public rights of navigation,
shall have been obtained.

E.  In the event of any relocation, replacement, major repair,
or abandonment of either of the pipe lines authorized by this
easement, Grantee shall obtain Grantor's written approval of
procedures, methods and materials to be followed or used prior
to commencement thereof.

F.  The maximum operating pressure of either of said pipe lines
shall not exceed six hundred (600) pounds per square inch
gauge.

|3|

If there is a break or leak or an apparent break or leak in either of said pipe lines, or if Grantor notifies Grantee that it has good and sufficient evidence that there is or may be a break or leak therein, Grantee shall immediately and completely shut down the pipe line involved and said pipe line shall not be placed in operation until Grantee has conducted a shut-in two (2) hour pressure test of six hundred (600) pounds per square inch gauge showing that no substance is escaping from a break or leak in said pipe line.

G.   If oil or other substance escapes from a break or leak in the said pipe lines, Grantee shall immediately take all usual, necessary and proper measures to eliminate any oil or other substance which may escape.

H.   In the event the easement herein conveyed is terminated with respect to either or both of said pipe lines, or if any part or portion of a pipe line is abandoned, Grantee shall take all of the usual, necessary and proper abandonment procedures as required and approved by Grantor.  Said abandonment operations shall be completed to the satisfaction of Grantor within one year after any abandonment of any part or portion of a pipe line; or in event of termination of this easement, within one year thereafter.  After the expiration of one year following the termination of this easement, Grantee

132

shall at the option of Grantor quit claim to the State of Michigan
all of its right, title and interest in or to any pipe line, appurte-
nances or fixtures remaining over, through, under or upon the bottom
lands covered by this easement.  Abandonment procedures as used
herein include all operations that may be reasonably necessary to
protect life and property from subsequent injury.

I.  Grantee shall permit Grantor to inspect at reasonable times
and places its records of oil or any other substance being trans-
ported in said pipe lines and shall, on request, submit to
Grantor inspection reports covering the automatic shut-off and
check valves and metering stations used in connection with the
Straits of Mackinac crossing.

J.  (1)  Grantee shall indemnify and hold harmless the State of
Michigan from all damage or losses caused  to property (including
property belonging to or held in trust by the State of Michigan),
or persons due to or arising out of the operations or actions of
Grantee, its employees, servants and agents hereunder.  Grantee
shall place in effect prior to the construction of the pipe lines
authorized by this easement and shall maintain in full force and
effect during the life of this easement, and until Grantor has
approved completion of abandonment operations, a Comprehensive
Bodily Injury and Property Damage Liability policy, bond or surety,
in form and substance acceptable to Grantor in the sum of at least
One Million Dollars ($1,000,000.00), covering the liability herein
imposed upon Grantee.

133

(2)  Grantee, prior to commencing construction of
the pipe lines authorized by this easement, shall
provide the State of Michigan with a surety bond
in the penal sum of One Hundred Thousand Dollars
($100,000.00) in form and substance acceptable to
Grantor, and surety or sureties approved by Grantor,
to well, truly and faithfully perform the terms,
conditions and requirements of this easement.  Said
bond shall be maintained in full force and effect
during the life of this easement and until Grantor
has approved completion of Grantee's abandonment
operations.  Said bond shall not be reduced in amount
except with the written consent of Grantor.

K.  Grantee shall within sixty (60) days thereafter notify
Grantor in writing of any assignment of this easement.

L.  The terms and conditions of this easement shall be bind-
ing upon and inure to the benefit of the respective successors
and assigns of Grantor and Grantee.

M.  All rights not specifically conveyed herein are reserved
to the State of Michigan.

134

N.   Grantee shall not improvise, construct or maintain ship-to-shore or ship-to-pipe line loading or unloading facilities over, through, under or upon any of the bottom lands herein described for the purpose of removing material from or injecting material into said pipe lines.

O.   Grantor shall have the right at all reasonable times and places to inspect the pipe lines, appurtenances and fixtures authorized by this easement.

P.   It shall not be a breach of the terms and conditions of this easement if for operating or maintenance reasons Grantee shall make use of only one of said pipe lines at a time.

Q.   Where provision is made herein that Grantee shall obtain the authorization, approval or consent of Grantor, Grantor agrees that it will not unreasonably withhold the same.

IN WITNESS WHEREOF, the State of Michigan by the Conservation Commission, by Wayland Osgood, Deputy Director, acting pursuant to authority specifically conferred upon him, has caused this instrument to be executed this twenty-third day of April, A.D. 1953.

Signed, Sealed and Delivered.
in the Presence of:

/s/ Jane Bower
Jane Bower


/s/ Elizabeth Soule
Elizabeth Soule

STATE OF MICHIGAN
BY THE CONSERVATION COMMISSION

By   /s/ Wayland Osgood
Wayland Osgood, Deputy Director,
pursuant to resolutions of the
Conservation Commission dated
February 13, 1953 and July 10,
1951

STATE OF MICHIGAN )
                    )     ss.
COUNTY OF INGHAM )

On this twenty-third day of April, A.D. 1953, before me, a
Notary Public, in and for said county, personally appeared Wayland Osgood,
Deputy Director, known by me to be the person who executed the within
instrument and who, being duly sworn, deposes and says that he is the duly
appointed deputy director of the Conservation Commission and that he
executed the within easement under authority specifically conferred upon
him by law and by the Conservation Commission at its meetings held on
February 13, 1953 and July 10, 1951; and who acknowledged the same to be
his free act and deed and the free act and deed of the State of Michigan
by the Conservation Commission, in whose behalf he acts.

                                   /s/ C. R. Humphrys
                                   C. R. Humphrys, Notary Public, Ingham County, Michigan
                                   My Commission expires September 20, 1954

Examined and approved 4/23/53
as to legal form and effect:


/s/ R. Glen Dunn
Assistant Attorney General